**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GEORGE SMILJANICH,

        PLAINTIFF,

                          CIVIL ACTION NO. 04-70505

V.

                          HONORABLE ARTHUR J. TARNOW

GENERAL MOTORS CORP.,          UNITED STATES DISTRICT JUDGE

        DEFENDANT.

                                  /

## FINDINGS OF FACT AND LAW

For the reasons that follow, this court finds that Plaintiff has established the five elements of an ERISA equitable estoppel claim as outlined by *Marks v. Newcourt Credit Group, Inc*., 342 F.3d 444, 456 (6th Cir. 2003). Additionally, this court rules that Plaintiff is entitled to attorney's fees pursuant to *Armistead v. Vernitron*, 944 F.2d 1287 (6th Cir. 1991).

1.     Plaintiff's testimony is credible.

2.     Plaintiff is currently a salaried employee of General Motors Corporation ("General Motors") working at the Powertrain Group Facility in Flint, MI.

3.     Plaintiff's pertinent initial employment date with General Motors is March 31, 1977.

4.     Beginning in 1986, Plaintiff worked as a salaried employee as a Senior Manufacturing Engineer at the Delco Chassis facility in Flint, Michigan.

5.     Plaintiff remained continuously employed with General Motors at the Delco Chassis facility from that date until September 1, 1998.

6.     On August 31, 1998, the General Motors/Delphi Coil Spring Division of Delco Chassis was sold to an investment banking firm, which operated the new business under the name of Chasco Systems Inc. ("Chasco")

7.     On September 1, 1998, Plaintiff opted to become a Chasco employee, as opposed to voluntarily quit his position at General Motors. Plaintiff's status as of this date was

"special separation, successor enterprise- Chasco."  At this time, Plaintiff had length of service with General Motors of  22 years and 9 months.

8.      Some time after transferring to Chasco, salaried employees affected by the sale of the Coil Spring business were provided a booklet entitled: "Your benefits and Status of the General Motors Salaried Employee Following the Sale of Delphi Chaffee Systems Coil Spring Operation" (hereinafter "Your Benefits").  This booklet advised salaried employees who were affected by the sale of Delphi Chassis of their benefit entitlement under General Motors benefit plans.

9.      The booklet included conflicting provisions concerning an employee's bridging his length of service in relation to benefits.  Page 5 of the booklet states:

> You will not be eligible for contributions for health care and basic life insurance coverage in retirement unless you are (1) eligible to retire from GM and receive such coverages and contributions in retirement as of the date of sale, or (2) terminated, other than for cause, by the successor company within three years of the date of transfer, return to GM, and retire from GM with eligibility for such coverages and contributions in retirement on the date of such retirement.  All benefits depend upon the terms and conditions of the plans in effect at the time of retirement or termination.

Page 14 of the booklet provides:

> On the date of sale, you will be separated from employment with General Motors.  The classification of separation will be "Special Separation- Sale Activity."  No Separation allowance will be paid by General Motors.
>
> In the event you accept employment with Chasco Corporation and subsequently are involuntarily terminated within three (3) years for reasons other than cause by Chasco Corporation, you will be given preferential hiring consideration over new hires for open positions at General Motors employing unit, provided you have the requisite skills to perform the duties of hte position, and Management determines you are as qualified as all other candidates.
>
> If you are re-employed by General Motors within 12 months following separation from General Motors, your General Motors length of service will be determined on the basis of the

circumstances of your individual case.

10.  Plaintiff received this booklet in March 1999.

11.  Despite Defendant's argument to the contrary, the two provisions are ambiguous as to whether an employee's service date bridges after their return to General Motors after twelve (12) months or thirty-six (36) months. Although General Motors did not act arbitrary and capriciously when it refused to consider bridging Plaintiff's service date, Plaintiff reasonably interpreted Page 5 to mean that if he went back to General Motors within three years after being terminated by Chasco for other than cause, his length of service would be bridged, and he would be entitled to contributions for health care and basic life insurance coverage in retirement.

12.  On September 1, 1999, General Motors issued a Policy Statement affecting employees or former employees of General Motors of Delphi which related to the movement of employees, former employees, of one company to the other. It provided for "continuous length of service to employees who moved between companies no later than December 31, 2001," and further provided that such employees could "use such continuous length of service to satisfy benefit eligibility provision, determining vacation entitlement, etc." Although, the Sixth Circuit determined that this policy statement did not apply to Plaintiff, it does factor in to whether agents or representatives of General Motors and Mr. Smiljanich believed that it applied to him.

13.  Between December 1999 and January 2000, Delphi removed Plaintiff from the "ineligible for employment" list thereby allowing him to seek re-employment with General Motors.

14.  On December 15, 1999, Plaintiff submitted a résumé to General Motors Powertrain Facility in Flint, MI.

15.  Plaintiff was interviewed on April 4, 2000. At which time, he also spoke to Deborah Marsh, a Staffing Center representative. After Plaintiff asked Ms. Marsh about certain

benefits, Ms. Marsh advised Plaintiff that if he was "hired by Powertrain it would be as if you never left General Motors."

16.   Although Ms. Marsh denies that she ever told Plaintiff this,  Deborah Marsh has no memory of that day, that she ever talked to Plaintiff, or that she ever received a fax sent by Plaintiff on May 19, 2000.  In addition, after the meeting, Mrs. Smiljanich spoke to her husband and also understood that his benefits would be bridged.  This further lends support to Plaintiff's version of events.  Thus, this court finds Plaintiff's testimony concerning the conversation to be more credible.

17.   Plaintiff reasonably relied on this verbal commitment in deciding to seek re-employment by General Motors.

18.   Bob Friedricks, a vice-president of St. Louis Rassini International talked to Plaintiff in spring of 2000 and offered him a job at the company that would include a good package with benefits.  The specifics of the benefits package and amount of compensation were not discussed.  Plaintiff turned down the offer because he fully believed that he only had around six additional years to work for General Motors before he could retire with full benefits.

19.   On June 1, 2000, Plaintiff received a letter offer of employment from General Motors. The offer advised that he would be employed on a day-to-day basis through an Orientation and Development period and that he would have no vacation entitlement in the year 2000.

20.   On June 5, 2000, Plaintiff sent a letter to Deborah Marsh accepting the position but asked for a confirmation on the status of his bridge-back, since it was not addressed in the letter offer.

21.   In response to Plaintiff's June 5, 2000 letter Diane LaLiberte,  a Human Resources Representative at the GM Powertrain Group in Flint, MI, requested the assistance of Bob Early, the Delphi Human Resources Representative, in transferring Plaintiff's former

2:04-cv-70505-AJT-WC   Doc # 39   Filed 03/09/07   Pg 5 of 14   Pg ID 2188

General Motors record to his new status as, again, a General Motors employee.   In response on June 12, 2000, Bob Early faxed the Delphi/General Motors Movement of Salaried Employees Policy Statement of September 1, 1999 to Diane LaLiberte.

22.   On July 14, 2000, Chasco System, Inc. closed.

23.   On July 17, 2000, Plaintiff was hired by General Motors as a Senior Manufacturing Engineer at its GM Powertrain Group in Flint, MI.  At this time, Plaintiff reasonably believed that his length of service was a bridged so that he would receive health care, life insurance and vacation benefits.

24.   At some point Diane LaLiberte, Human Resources Representative at Powertrain, annotated Mr. Smiljanich's June 5, 2000 letter with explanations as to why Plaintiff's length of service should not be bridged to March 31, 1977.

25.   The first time that Plaintiff ever saw his June 5, 2000 letter with LaLiberte's annotations or was told of its contents was after this case had been filed.  Circumstances indicate that LaLiberte wrote these answers a long time after receiving the letter.

26.   Diane LaLiberte does not recall discussing Plaintiff's June 5, 2000 letter with him and could only "assume" that she communicated this information to him.

27.   Human resources coded Plaintiff into the computer so that he immediately had health care coverage for his family and himself upon his return to General Motors.  This signified that Plaintiff had been bridged since new hires were required to put in a certain amount of time prior to receiving health care benefits.

28.   In 2000, Plaintiff's personal record reflected a length of service date of March 31, 1977 as well as an entitlement to five weeks of vacation.  Both of these facts corresponded to length of service of over 20 years, signifying again that Plaintiff's length of service was bridged.

29.   Despite what was stated in the June 1, 2000 letter of employment, Plaintiff was not required to go through an orientation period when he returned.  This again indicated that

Page 5 of  14

Plaintiff was a considered a bridged employee.

30.     Plaintiff took 25 days of vacation in 2000, further indicating that he was a bridged
        employee.

31.     When Plaintiff received his 2001 Personal Total Compensation Summary, his vacation
        summary indicated he was a bridged employee  but his credited service was listed at
        "zero years and six months" as of December 31, 2000.  After receiving this, Plaintiff
        contacted Diane LaLiberte by email with various questions regarding his benefit
        entitlement.

32.     On May 29, 2001, Plaintiff received a letter from the Pension Administration Center
        indicating that his credited service was changed from six months to 23 years and three
        months.

33.     Plaintiff was also provided with a calculation of credited service form dated May 23,
        2001.  Calculated by Barb Brady, the form indicates that Plaintiff's credited service
        reads 6 months but should read 23 years and 3 months, an adjustment of 22 years and 9
        months.

34.     On June 7, 2001, Plaintiff received a note from Diane LaLiberte stating:

        > I spoke to Barb [Brady] and faxed her the Katie Barclay letter [September
        > 1, 1999 Policy Statement], but upon closer examination it states that your
        > LENGTH OF SERVICE will be continuous for eligibility for vacation and
        > benefits.  Credited service can only cover the time you were on GM
        > payroll.  Barb will still re-check this and get back to us.

35.     On June 19, 2001, Plaintiff emailed Diane LaLiberte requesting the same information
        that he requested in his June 5, 2000 letter.

36.     The response by LaLiberte to Plaintiff's email of June 19, 2001 and her subsequent
        emails requesting information on his behalf, compel the conclusion that the annotations
        on the June 5, 2000 letter were after the year 2000 and not given to Mr. Smiljanich until
        after this lawsuit was filed.  If this were not the case, LaLiberte's responses and emails
        indicating that Mr. Smiljanich was still waiting for an answer would not make sense.

37.     On January 8, 2002, Plaintiff again sent an email to Diane LaLiberte asking for a
        response to his questions that he raised six months prior.

38.     LaLiberte then forwarded Plaintiff's June 19, 2001 email along with other
        correspondence to Preston M. Crabill and Jeffrey W. Johnson asking for answers while
        pointing to the September 1, 1999 Policy Statement.

39.     On January 9, 2002, Plaintiff again emailed Diane LaLiberte requesting a confirmation of
        the re-check that she referred to in her note to him of June 7, 2001.

40.     On January 23, 2002, Plaintiff received a note from LaLiberte which stated, "George-
        your length of service is 3/31/77.  Your credited service has been updated and should
        appear on the annual benefits statement you receive in mid-March."  LaLiberte admits
        that when she gave Plaintiff the note, she believed that his service was going to be
        bridged to 1977.

41.     On February 6, 2002, Sharon Ridgell sent an email to Stephanie Sullivan, which was then
        forwarded to LaLiberte.  Ridgell explained why Mr. Smiljanich's service dates should be
        July 17, 2000.  In her forwarded email, Sullivan asked LaLiberte to correct the records
        and change the service date from March 31, 1997 to July 17, 2000.  Despite this request,
        the personnel records at General Motors were not changed subsequent to the instruction
        of LaLiberte to make the change.

42.     Defendant claims that soon after learning this information from Ridgell, LaLiberte
        advised Plaintiff about Ridgell's email which would result in Plaintiff's length of service
        date beginning July 17, 2000.  However, LaLiberte's responses to Mr. Smiljanich
        questions indicate otherwise.

43.     On March 8, 2002, Plaintiff sent an email to LaLiberte concerning the final confirmation
        of his bridging, and specifically asking whether his "credited service" and "length of
        service" were correct.  This email indicates that even though LaLiberte believes she may
        have advised him of the change, she did not talk to Plaintiff about Ridgell's conclusion

Page 7 of  14

that he was not entitled to be bridged.

44.   Moreover, on March 22, 2002, LaLiberte responded to Plaintiff:

> I agree nine months is a long time to wait for answers to your questions.  It may take a bit longer.  Please have patience and don't be anxious if you can help it. Take comfort in the fact that you have sympathetic friends who are working to get your answers from the highest level of the corporation.

This email is again inconsistent with her testimony that she conveyed to Plaintiff Ridgell's conclusion that he was not entitled to a bridge of his length of service.  As a result, this court finds Mr. Smiljanich's testimony to be more credible on this subject. Accordingly, Plaintiff was not told by LaLiberte of the Ridgell email.

45.   April 15, 2002, Frank McGeogh (Plant Personnel Director) wrote to Cindy Gier (Director of the GM Policy Committee) requesting that consideration be given to bridging Plaintiff's length of the service back to March 31, 1977.

46.   From April 2002 through January 2003, the Employee Service Center Benefits Summaries, which were available to employees, continued to record Plaintiff's length of service as bridged.

47.   On June 27, 2002, Cindy Gier responded to Frank McGeogh advising that after review, the determination was made that Plaintiff's length of service would not be bridged and that he would be treated the same as any other employee hired in calendar year 2000.

48.   On June 28, 2002, Frank McGeogh told Plaintiff that his length of service would not be bridged.  This Court finds that this the first time Plaintiff was ever told that he would not be eligible for the bridge.  Plaintiff was then informed that he could appeal this decision internally through the Employee Benefit Plans Committee.

49.   On July 22, 2002, McGeogh and Flint North Plant Manager, Joseph Choate, wrote to William Tate and Robert Krause of the Human Resources Department at GM Powertrain, requesting their assistance to petition GM Policy Development and the GM Employee Benefit Plans Committee to reconsider their decision.

- When [plaintiff] was released to seek reemployment with GM or Delphi, it was his understanding that the 9/18/98 policy regarding Chasco would allow for his re-hire as a GM employee. It was also the understanding of Delphi HR, the Talent Acquisition Center and Powertrain at that time, and Mr. Smiljanich was so informed.
  ...

- Upon his re-hire to GM his length of service date was bridged at 3/31/1977 by collaboration of Talent Acquisition and Delphi Human Resources, thus making him eligible for the GM benefits Plan for employees with service dates prior to 1/1/93.

50. On August 8, 2002, Cindy Gier forwarded an email to the Personnel Director and Plant Manager of Powertrain Flint, confirming the original decision.

51. On August 12, 2002, Plaintiff wrote the Employee Benefits Committee appealing the decision to deny him a bridge of his length of service, as had been recommended by the Policy Committee.

52. In September 2002, Robert Friedricks called Plaintiff in part to determine his interest in the plant manager position that would include a good package. Plaintiff again turned down the offer because he still believed that the appeal process could produce a positive outcome for him.

53. On October 11, 2002, a Report was provided to members of the GM Employee Benefits Plans Committee regarding Plaintiff's request to bridge his length of service. The Secretary to the Committee presented the facts and background of the case and requested that the Committee uphold Plaintiff's benefit entitlement under GM benefit plans based only on a length of service beginning July 17, 2000.

54. On October 16, 2002, the Committee determined that Plaintiff's benefit eligibility under GM benefit plans was tied to his length of service date and that he was being treated appropriately considering that his length of service date was July 17, 2000.

55. On January 13, 2003, GM Employee Benefit Plans Committee advised Plaintiff that his appeal was denied. The letter indicated that the Committee only applied the guidelines

issued by the Policy Committee.  The Committee continued by stating that it did not make a decision concerning his length of service, since the Committee "does not... decide disputes regarding an employee's length of service" since the length of service is "determined by GM policy and an employee's length of service."

56.  Plaintiff reasonably relied upon the representations made by various agents and representatives of General Motors, including Human Resources and Staffing, in determining to return to General Motor rather than pursue other employment opportunities such as the job offered to him at Rassini.

57.  Plaintiff relied upon the ongoing representations of agents and representatives of General Motors in 2002, who diminished the seriousness of the problem that had arisen urging him to go through the internal appeal process, and offered to assist in that process.

58.  Plaintiff's reliance upon the ongoing representatives was also reasonable under the circumstances.

59.  Plaintiff was instructed to appeal to Benefits, although the Benefits Committee had no authority to change the policy, which defined the phrase "length of service."

60.  Although Plaintiff was instructed to appeal to the Policy Committee, Sharon Ridgell knows of no one at General Motors who could have overruled the existing policy.

61.  General Motors, through its representatives and agents, was aware that no one at General Motors had the ability to change the policy to give to Plaintiff a bridge of his length of service, notwithstanding what he was being told.

62.  Plaintiff's reliance on the statements and documents caused him to not to seek other employment with different compensation and benefits and left him without company provided health care and life insurance for retirement.

63.  The conduct of General Motors under these circumstances is culpable and was in bad faith.

64.  A review by General Motors of its own records should have at least warranted a

recognition that the only thing that could have been done under the circumstances was to grant a bridge of length of service.

65.     The Sixth Circuit has remanded this case to determine whether Plaintiff's ERISA claim of equitable estoppel is meritorious.

66.     The Sixth Circuit has recognized that "equitable estoppel may be a viable theory in ERISA cases." *Marks v. Newcourt Credit Group, Inc*., 342 F.3d 444, 456 (6th Cir. 2003)(citation omitted).

> To set forth a claim for equitable estoppel in the ERISA context, a plaintiff must plead five elements:  (1)There must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment.

*Id*.(citation omitted).

67.     The principles of equitable estoppel cannot be applied to vary the terms of an unambiguous plan document. *Sprague v. General Motors, Corp*., 133 F.3d 388, 404 (6th Cir. 1998).  However, the Sixth Circuit suggested and this Court finds that the plan's documents were ambiguous. *See* Paragraph 11.  Thus, Plaintiff's the test used in *Marks* should be applied to the facts of this case.

68.     This Court finds that statements made by that GM's agents' and representatives' and their conduct prior to and after Plaintiff became re-employed with General Motors materially represented to Plaintiff that his length of service would be bridged from the March 31, 1977 date.  These false material representations were further embodied in documents provided to Plaintiff throughout this time period.  Moreover, Plaintiff was treated as a bridged employee since he took five weeks of vacation, was immediately insured and did not have to participate in an orientation.  This too represented to Plaintiff that he was in fact a bridged employee.

69.     This Court finds that General Motors understood its policies and further finds that
         General Motors was aware of the true fact that the appeals process was an illusory
         process that could never have aided a person in Mr. Smiljanich's position, despite his
         being encouraged to continue with his appeals from General Motors' agents and
         representatives.  The Policy Committee stated in its final report and Sharon Ridgell
         testified that neither the Committee nor anyone at General Motors was able to decide
         disputes as to an employee's length of service.  The Policy Committee and everyone else
         was powerless to consider Smiljanich's unique set of facts and circumstances.  Thus, the
         entire appeals process was a waste of everyone's time and resources.  Had Plaintiff
         known that his request could never be fruitful, he could have negotiated for a lucrative
         salary or determined a way to pay for health care for he and his wife after retirement.
         Instead, from when he first spoke to Marsh regarding his entitlement to benefits until
         January 13, 2003 the date he received the Committee's letter, Plaintiff relied on the
         statements of General Motors' agents and representatives and company documents that
         led him to believe that his length of service would be bridged entitling him to certain
         benefits.  Plaintiff also relied on the representations made to him by those at General
         Motors that going through the appeals process may lead to a favorable decision.  Relying
         on General Motors' representations led to negative consequences because as it turns out
         Plaintiff was not and could never be considered a bridged employee despite
         representations to the contrary.

70.     Plaintiff was unaware of the true fact that he would never be able to have his employment
         bridged and that neither the Employee's Committee nor anyone at General Motors could
         do anything about the situation.

71.     Plaintiff reasonably believed that General Motors, through its agents and representatives,
         intended the false representation be acted upon.

72.     Plaintiff reasonably and justifiably relied on these representations to his detriment, *i.e.*,

not pursuing other employment opportunities that would provide for certain benefits or allow Plaintiff to pay for such benefits.

73.     Plaintiff satisfies the five elements of a valid equitable estoppel claim under ERISA as outlined by *Marks*.

74.     As to the attorney's fees issue, the Sixth Circuit has adopted a five-factor test.  The factors include: (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect on an award on other person under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' position.  *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991).

75.     General Motors refusal to bridge Smiljanich's service date is one of betrayal given that "this valuable, long-term employee never chose to leave GM and he returned to the company as soon as he was able to."  In terms of the first factor, General Motors personnel continually represented to Plaintiff through statements and documents that his service with General Motors would be bridged and that the appeals process may help. General Motors now admits that Plaintiff never qualified for a bridge of service and that the established appeals process was nothing more than a Sisyphian task.  General Motors conduct in this case is outrageous considering Plaintiff's concerns about his future, his loyalty to the company and his good faith, vigilant effort to determine his entitlement.

76.     General Motors is able to satisfy an award of Plaintiff's attorneys fees.

77.     This Court believes that an award for attorneys fees will deter General Motors from treating its loyal employees in a similar manner and impress upon the company the necessity of honoring the commitments it makes to its employees.

78.     The fourth factor is inapplicable to the case at hand.

79.     The fifth factor relating to the relative merits of the parties' position also fall in Plaintiff's

favor.

80.      After considering the five factors, this Court rules that Plaintiff shall be awarded

attorneys' fees.


s/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  March 9, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on
March 9, 2007, by electronic and/or ordinary mail.

s/Theresa E. Taylor
Case Manager